In re **GENTIVA SECURITIES LITIGATION.**

No. 10–cv–5064 (ADS)(WDW).

United States District Court, E.D. New York.

Sept. 19, 2013.

Order Denying Reconsideration in Part Dec. 10, 2013.

306

Frederic S. Fox, Esq., Joel B. Strauss, Esq., Laurence D. King, Esq., Justin B. Farar, Esq., Jeffrey P. Campisi, Esq., Kaplan Fox & Kilsheimer LLP, New York, NY, for the Plaintiff Los Angeles City Employees' Retirement System.

Joshua S. Amsel, Esq., Stefania D. Venezia, Esq., Matthew E.K. Howatt, Esq., John A. Neuwirth, Esq., Weil, Gotshal & Manges LLP, New York, NY, for the Defendants Gentiva Health Services, Inc., Ronald A. Malone, H. Anthony Strange, John R. Potapchuk, Eric R. Slusser.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The present case is a consolidated securities fraud class action brought on behalf of a class consisting of all persons or entities that purchased the publicly traded securities of Gentiva Health Services, Inc. ("Gentiva") between July 31, 2008 and October 4, 2011. The complaint was filed by the Lead Plaintiff the Los Angeles City Employees' Retirement System (the "Plaintiff" or "LACERS").

On March 25, 3013, the Court dismissed the Plaintiff's original consolidated class action complaint in its entirety. *See In re Gentiva Sec. Litig.*, 932 F.Supp.2d 352 (E.D.N.Y.2013) (Spatt, J.). In particular, the Court dismissed with prejudice the Plaintiff's claims under §§ 11 and 15 of the Securities Act of 1933 (the "1933 Act"). The Court also dismissed without prejudice the Plaintiff's claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b–5 promulgated thereunder. *See* 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b–5.

On May 10, 2013, the Plaintiff filed an amended consolidated class action complaint. On June 24, 2013, the Defendants moved to dismiss the amended consolidated class action complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.") and the Private Securities Litigation Reform Act ("PSLRA") of 1995, 15 U.S.C. § 78u–4(b).

For the following reasons, the motion is granted in part and denied in part.

## I. BACKGROUND

### A. *Factual Background*

Familiarity with the facts of this case is presumed. However, by way of background, the following facts are drawn from the original consolidated class action complaint and construed in a light most favorable to the Plaintiff.

### 1. *The Parties*

The Defendant Gentiva is a home health care provider corporation with its principal headquarters in Atlanta, Georgia. The Individual Defendants are current and/or former directors and/or officers of the company. The Defendant Ronald A. Malone previously served as Gentiva's Chief Executive Officer from June 2002 until December 2008, and as Chairman of the Board of Directors until May 2011. The Defendant H. Anthony Strange served as Gentiva's President beginning in 2007, and served as its Chief Operating Officer from November 2007 through May 2009. Strange then became the company's Chief Executive Officer in January 2009, and its Chairman in May 2011. The Defendant John R. Potapchuck served as Gentiva's Chief Financial Officer and Treasurer until May 2010. He was succeeded in May 2010 by Eric R. Slusser, who currently serves as the company's Chief Financial Officer, Treasurer, and Executive Vice President.

### 2. *The HH PPS*

The Social Security Act requires that for patients to be eligible for home health benefits such as nursing care, the beneficiaries must be homebound and there must be a medical necessity for the services that are provided. Medicare pays for these home health services through a prospective payment system or "PPS." Under this home health prospective payments system (the "HH PPS"), a home health service provider is paid in advance for a substantial portion of the total payment to which they are entitled to for a given patient. These payments are based on things such as "a predetermined rate schedule estab-

lished by Medicare," as well as "a pre-treatment assessment of the given patient's condition and proposed plan of care during a 60–day time period." (Compl. ¶ 28.) Gentiva is one such home health provider that receives payments from Medicare through the HH PPS.

According to the Defendants, both federal regulations and Medicare's Policy Manual make clear that independent physicians, as opposed to the home health provider itself, direct and oversee the billing process. In other words, a patient will only receive treatment after a physician prescribes a home health plan of care, which includes: the type of services to be provided; the professional who will provide the services; the nature of the individual services; and the frequency of the services. *See* 42 C.F.R. § 409.43(b) ("The physician's orders for services in the plan of care must specify the medical treatments to be furnished as well as the type of home health discipline that will furnish the ordered services and at what frequency the services will be furnished."). In addition, any changes in the plan of care must be approved by a physician. *See id.* at § 409.43(c).

On the other hand, the Plaintiff claims that Gentiva had near absolute discretion to dictate the terms and frequency of patient care in order to achieve particular "bonus" thresholds. The Plaintiff alleges that Gentiva played a critical role in determining how much money Medicare would pay for its services after a physician prescribed a home health plan. In this regard, the Plaintiff alleges that after a physician prescribed a home health plan of care, a Gentiva nurse or therapist assessed the patient's condition and needs at the beginning of each episode of care. As part of this assessment, a form was completed entitled the Outcome and Assessment Information Set ("OASIS"), which detailed a patient's condition and expected therapy needs. This information was used to classify patients in accordance with a classification system known as the "case-mix adjustment" to adjust payments for home health services under the PPS. This system was developed by the Centers for Medicare and Medicaid Services ("CMS"). Accordingly, the OASIS was utilized to determine how much money Medicare ultimately paid Gentiva for its services. The Plaintiff alleges that the proper completion of the OASIS by Gentiva—not the physician—was a key and critical factor in determining how much Gentiva would be paid for its services by Medicare.

The above described system is prospective, hence it was a prospective payment system. Gentiva would generally receive an upfront payment from Medicare of approximately sixty percent of the estimated payment entitlement. However, the final payment was ultimately based on the actual number of visits provided to the patient. (Compl. ¶ 34.)

Prior to and through 2007, the HH PPS provided an additional payment or "bonus" of up to $2,200 if Gentiva provided a patient with ten therapy visits in connection with one individual's treatment cycle, otherwise known as an "episode." However, in 2008, this "bonus" threshold was modified and the new thresholds became six, fourteen, and twenty therapy visits per treatment cycle. As a result, Gentiva could potentially obtain higher payments from Medicare if the number of patient visits reached these new thresholds.

Also relevant is that the thresholds needed to be reached within each sixty-day episode period, which is the time period covered by the physician's initial proposed plan of care. Gentiva would determine after the initial episode of care whether to "recertify" a patient for an additional episode of care. According to the Plaintiff,

re-certifications increased the company's profits because less paperwork was associated with these patients.

In light of the HH PPS and the modified threshold levels for Medicare reimbursement, the Plaintiff alleges that in order to increase revenues and margins per episode, Gentiva's managers and clinicians were pressured by senior executives to provide patients with medically unnecessary visits and services in order to reach the enhanced payment thresholds from Medicare.

### 3. *Former Gentiva Employees As Confidential Witnesses*

The original consolidated class action complaint is largely based upon interviews with former Gentiva employees, including managers and clinicians. The allegations from most of these former employees appear in the complaint as those of confidential witnesses ("CWs"). According to the Plaintiff, these former employees describe how Gentiva executives knew of and themselves applied pressure on Gentiva managers and clinicians, through periodically scheduled and ad hoc meetings, emails, and conference calls, to violate Medicare rules in order to increase Medicare payments. Specifically, these executives are alleged to have urged employees (1) to provide medically unnecessary visits to patients in order to reach the thresholds required by Medicare to receive bonus payments (Compl. ¶¶ 52–61); (2) to wrongfully "upcode" in order to increase a patient's "case-mix weight"; (3) to recertify patients for added episodes of care even if additional visits were not medically necessary (Compl. ¶¶ 56–60); (4) to manipulate OASIS forms to increase reimbursement from Medicare (Compl. ¶¶ 53–61); (5) to wrongfully manipulate diagnostic codes in order to generate the greatest reimbursement from Medicare (Compl. ¶¶ 59–60);

and (6) to provide medically unnecessary services to increase Medicare reimbursement revenues and margins (Compl. ¶¶ 52–61). The allegations by the CWs were as follows:

- CW1, a Physical Therapist, was an Orthopedics Director at Gentiva from April 2004 until May 2010, and played a supervisory role over certain branch offices. CW 1 stated that throughout the Class Period, either by way of periodic meetings and/or emails, he/she was subjected to pressure from supervisors—an "Area Vice President" (Area VP) and a "Regional Vice President" (Regional VP)—to increase the number of patient visits provided in order to hit the next highest enhanced Medicare reimbursement threshold, regardless of the patients' medical needs. CW 1 left Gentiva because of the "threshold pressure." (Compl. ¶ 53.)

- CW2 was Director of Gentiva's Las Vegas, Nevada branch office from July 2006 through April 25, 2010. From at least January 2010 until this CW's resignation, CW 2 felt frequently pressured by an Area VP to either pressure clinicians to provide medically unnecessary visits to patients to meet the budget projections and/or to pressure clinicians under CW 2's supervision to increase case mix weights assigned to patients in a way that would result in increased payments from Medicare. In April 2010, CW 2 resigned from Gentiva, primarily because of what CW 2 believed to be undue pressure to engage in improper business practices. (Compl. ¶ 54.)

- CW3 was the former Branch Director of Gentiva's Albuquerque, New Mexico Office from 2007 through 2010, and was under the

same regional direction as CW2. CW 3 believes that periodic comments made to him/her by an Area VP were intended to put pressure on CW 3 to increase revenue for the Albuquerque branch by providing medically unnecessary services. This is the same Area VP who allegedly pressured CW2. (Compl. ¶ 55.)

- CW4, a nurse employed by Gentiva from February 2008 through October 2009, was the manager of Clinical Practice during that time period. CW 4 described being subjected to pressure from superiors to meet the enhanced Medicare payment thresholds of 6, 14 or 20 visits and noted how this was often referred to internally as "hitting the magic numbers." CW4 also alleges that during weekly teleconference calls with his/her immediate supervisors and certain unidentified Gentiva executives, he/she was regularly instructed by superiors to relay the message to clinicians that "they were not putting in enough therapies," and that they needed to increase the number of patient visits, which CW 4 interpreted to mean the provision of unnecessary services. (Compl. ¶ 56.)

- CW5 was employed as a Compliance Specialist at Gentiva from December 2002 through May 2009. CW5 assisted with various internal audits and was also responsible for handling "first line screening" of incoming calls to the Company's compliance hotline. CW 5 recalled receiving several calls in the 2008 to 2009 time-frame from Gentiva employees from the upstate New York area that felt they were being asked by management to add or provide treatments to patients that were not needed and that at least one therapist described as "not ethi-

cally correct." CW5 passed these complaints along to an individual named Margo Nemet, who in turn reported to the Company's Chief Compliance Officer. (Compl. ¶ 57.)

- CW6 was a nurse who worked at Gentiva's Binghamton, New York branch from January 2010 through September 2011. CW6 alleges to have been frequently pressured by her supervisors to complete initial OASIS forms in a way that would result in a higher need for home health services than a patient actually needed and would therefore result in higher payments to Gentiva from Medicare. CW6 allegedly told his/her Branch Manager that he/she was uncomfortable with patient assessment and Medicare billing practice instructions, and it was CW6's "understanding" that the Branch Manager shared these concerns with unidentified senior Gentiva management. (Compl. ¶ 58.)

- CW7 was also a nurse who worked at Gentiva's Binghamton, New York branch from January 2009 through August 2011. CW7 alleges that his/her supervisor, Gentiva's Area Director of Clinical Operations, would ask CW 7 to improperly modify OASIS forms in a way that would result in medically unnecessary services being provided to patients in order to increase Medicare revenue, and also to press clinicians under CW 7's supervision to push for enough visits to patients to hit the next highest enhanced Medicare payment threshold, regardless of the patients' needs or even the patients' desires for such treatment. The types of wrongful pressures were often exerted through informal discussions between Gentiva management and

branch managers and clinicians. However, according to CW7, it was also exerted through and during more formal and periodic in person and/or telephone meetings during which data listed in various periodic reports was discussed. In June 2011, CW 7 called Gentiva's internal compliance hotline to complain about Gentiva clinicians being unduly pressured to provide patients with unnecessary visits and/or therapies. CW 7 sent a resignation letter to his/her supervisor in which CW 7 noted that the reasons for CW 7's resignation included the belief that the Company exerted continuous pressure on employees to put finances over patient care. (Compl. ¶ 59.)

The Plaintiff also references allegations from two identified individuals. Former Gentiva employee Holly McComas is a registered nurse who was employed by Gentiva as a case manager at its Charleston, West Virginia branch beginning in 2007. She alleges that notwithstanding the fact that she was the person who made the intake assessment for patients in OASIS, she was not permitted to code for the diagnoses and treatments related to her assessments. Instead, this coding was done by the manager of clinical practice at that branch office, which McComas would then write in her own handwriting. In many instances, McComas believed she was being required to write the codes on the forms in a manner that maximized reimbursement from Medicare rather than being truly reflective of the patients' medical conditions and/or that the number of visits being entered on the OASIS were not medically necessary. In addition, during her tenure at Gentiva, McComas regularly observed practices aimed at pressuring physical therapists employed by Gentiva to continue physical therapy notwithstanding that the patient had

reached maximum medical improvement. Finally, on January 22, 2010, McComas placed a telephone call to Gentiva's Regional Director of Human Resources to complain about fraudulent Medicare billing practices at Gentiva's Charleston branch. (Compl. ¶ 60.)

The Plaintiff also references allegations from Kim Shah, a Registered Nurse, who began working for Gentiva on or about February 12, 2001 as a manager of clinical practices at the Charleston, West Virginia branch, and was then promoted to director of clinical practices and later to branch director. According to Shah, employees were regularly told by Gentiva's Regional VP during weekly conference calls that anyone over 65 needed more than 12 therapy visits, and that such therapy should be provided as a matter of course. Shah further related that she was regularly subjected to pressure by this Regional VP and unidentified others at periodic meetings to try to get clinicians in the office to increase the number of visits to patients so as to obtain enhanced payment thresholds from Medicare, even if such visits were not medically necessary.

### 4. Alleged Misrepresentations

During the Class Period, the Defendants repeatedly represented in SEC filings and other public statements that Gentiva was "in compliance" with Medicare "standards and regulations". Furthermore, Gentiva also represented that it maintained a "robust" and "best-[in]-class" compliance department. (Compl. ¶ 181.) In addition, Gentiva represented to its investors that its revenues, including its growing profit margins per episode—a metric closely observed by investors—were being legitimately earned. However, according to the Plaintiff, a series of partial disclosures revealed the risks concerning Gentiva's business. .

### 5. *The SFC and SEC Investigations*

On May 13, 2010, the Wall Street Journal reported that "the [U.S. Senate Finance Committee or] SFC launched an investigation into the practices of companies that provide inhome therapy visits reimbursed by Medicare, including Gentiva." (Compl. ¶ 248.) Further, on July 13, 2010, Gentiva disclosed that the U.S. Securities and Exchange Commission ("SEC") had also commenced an investigation relating to Gentiva's participation in the HH PPS. On October 3, 2011, after a seventeen month investigation, the SFC released a Report on Home Health and the Medicare Therapy Threshold (the "SFC Report"). The SFC examined the home health therapy practices of each of the four largest publicly-traded home health companies. The Plaintiff alleges that the SFC found, based on nonpublic data provided to it by Gentiva, that when Medicare changed the number of visits required for home health care providers to receive bonus payments in 2008 from ten visits to six, fourteen, and twenty visits, there was a statistically significant drop of twenty-five percent in the number of patients Gentiva provided with ten visits, and at the same time, a statistically significant increase of up to thirty-one percent in the number of Gentiva patients who were suddenly receiving 6, 14, and 20 visits.

Further, the SFC Report describes certain emails and documents that, according to the Plaintiff, demonstrate that the statistical shift was not an accident. For example, multiple internal email exchanges among senior Gentiva executives, including the Defendant Strange, make clear that in the months leading up to and subsequent to the January 1, 2008 changes in therapy thresholds, the Defendants were attempting to ascertain how the changes would impact the Company's revenue and earnings, as well as how they could increase Medicare revenues in light of the new system.

One particular email emphasized by the Plaintiff—and the only communication directly involving one of the Individual Defendants—was from Perri Southerland of Gentiva's Finance Department to Defendant Strange. This communication stated that as a follow-up to a discussion they had, Southerland performed an analysis which thought of a way for Gentiva to increase it's per episode reimbursements by $350 to $550 under the new Medicare threshold requirements. It was made clear that the goal was to reach the six visit threshold for enhanced Medicare payments. As the Plaintiff points out, the medical needs of the patients were not mentioned as a factor in the analysis.

In response to these allegations, the Defendants maintained that the SFC did not conclude that Gentiva and its senior management caused Gentiva's employees and clinicians to seek reimbursement from Medicare for medically unnecessary services in direct violation of Medicare standards and regulations. In this regard, the original consolidated class action complaint did not contain any allegation that the SEC or any other governmental or regulatory agency has instituted any action or proceeding alleging wrongdoing arising from Gentiva's participation in the HH PPS.

### B. *Procedural Background*

On January 27, 2012, 281 F.R.D. 108 (E.D.N.Y.2012), the Court granted LACERS' motion to be appointed as lead plaintiff in this action pursuant to 15 U.S.C. § 78u–4(a)(3)(B), as amended by the Private Securities Litigation Act of 1995. The Court also granted the motion by LACERS for the appointment of Kaplan Fox & Kilsheimer LLP as lead counsel. A consolidated class action complaint

was filed by LACERS on April 16, 2012. Thereafter, on June 15, 2012, the Defendants filed a motion to dismiss for failure to state a claim.

On March 25, 2013, the Court granted the Defendants' motion to dismiss the original consolidated class action complaint in its entirety. In particular, the Court dismissed the Plaintiff's 1933 Act claims with prejudice for lack of standing and for failure to state a claim.

The Court observed that to state a claim under Section 10(b) of the 1934 Act and Rule 10b–5 for misrepresentations, "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." (Memorandum and Order, 932 F.Supp.2d at 366.)(quotation marks and citations omitted)

As to the materially false or misleading statements or material omissions, the Court held that Gentiva's representations in its financial results and SED filings that its revenues and margins were growing, and that Gentiva was complying with Medicare standards and regulations, were pleaded with sufficient particularity. However, the Court held that statements made by Gentiva executives that Gentiva had a "robust" compliance program that was "best-[in]class" constituted corporate puffery rather than actionable misrepresentations. Similarly, the Court concurred with the Defendants that their Sarbanes–Oxley certifications could not constitute a misstatement or omission for purposes of Rule 10b–5 liability.

The Court further found that two of the three alleged partial corrective disclosures were sufficient to plead the element of loss causation. In this respect, the Court agreed with the Defendants that neither of Gentiva's negative earnings announcements could qualify for purposes of loss causation. Nonetheless, the Court accepted, as a basis for loss causation, the SFC Report and the fact that Gentiva's stock price dropped after the announcements that the SFC launched an investigation into the practices of companies that provide in-home therapy visits reimbursed by Medicare, including Gentiva. The Court "reject[ed] the idea that the disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure." (*Id.* at 387.) In the Court's view,

[t]o embrace this notion would be to preclude any type of action such as this, where there has been no conclusive finding of fraud by a government agency, or a criminal charge initiated, or a formal corrective disclosure by the defendant. Here, there are factual allegations of fraudulent conduct, and at this stage of the litigation, the Court must accept these factual allegations. To preclude this suit on the basis that there has been no previous actual disclosure of fraud from sources such as whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, or newspapers, misses the mark. The inherent veracity of the information is the paramount concern and the form that it takes it not as critical. To find that the Plaintiff can only succeed here if there is something exposed that is more than a possibility or probability or indicator of fraud is too narrow a view.

(*Id.* at 387–88.)

However, the Court held that the Plaintiff failed to adequately plead scienter on the part of the Individual Defendants or Gentiva.

First, the Court held that the Plaintiff failed to allege sufficient circumstantial evidence of conscious misbehavior or reck-

lessness. In this regard, the court noted that the Plaintiff referenced a number of Gentiva internal documents and emails which, according to the Plaintiff, "demonstrate that in the months leading up to Medicare's changes in the number of visits required for enhanced payments, Gentiva's top executives were apprised of these changes and more importantly, how Gentiva could take advantage of these changes." (*Id.* at 373.) In the Court's view, these communications did not suffice, in and of themselves, to establish scienter because they did not "demonstrate a leap in logic from legal behavior—increasing therapy visits in a medically necessary way in order to maximize profits—to illegal behavior—increasing therapy visits in ways that are not medically necessary in order to maximize profits." (*Id.* at 373–74.)

The Court next addressed the accounts of the Confidential Witnesses ("CWs") who shared concerns "that they were being subjected to pressure from their direct supervisors to increase the number of patient visits provided in order to hit the next highest enhanced Medicare reimbursement threshold, regardless of the patients' medical needs." (*Id.* at 375.) The Court acknowledged that the CWs

> [we]re described with sufficient particularity so that the person in each respective position would have the information that each CW purports to have. The CWs' positions are all amply described, including their title, responsibilities, and duration of employment. In addition, the CWs explain the basis for their allegations, namely the pressure and directives from various supervisors, both by expressly naming these supervisors and by providing the mode through which these mandates occurred.

(*Id.* at 377.) Further, the Court noted that the fact that the CWs emanated from

ranks and different geographies supported a finding of scienter.

However, the Court concluded that the "Plaintiff's allegation that the Executive Defendants tolerated [or encouraged medically unnecessary therapy visits for financial gain] is conclusory because [the] Plaintiff does not plead that any of the Executive Defendants were even aware of the practice." (*Id.* at 378.) In this regard, the Court determined that the Individual Defendants' "[k]nowledge of the company's number of therapy visits and corresponding profits 'does not equate to harboring a mental state to deceive, manipulate, or defraud.'" (*Id.* at 378.) (citation omitted).

Second, the Court reasoned, the Plaintiff failed to sufficiently point to the Individual Defendants' potential motives and opportunity to engage in fraudulent behavior. In this respect, the Court considered the Plaintiff's contention that the Individual Defendants were motivated to engage in wrongful conduct in order to sell inflated Gentiva securities and to raise capital so that it could acquire another company called Odyssey. The Court held that absent factual allegations regarding the net profits or the timing of these sales, the Plaintiff failed to sufficiently allege motive and opportunity for the Individual Defendants to engage in wrongful behavior. The Court also rejected the Plaintiff's allegation that the Individual Defendants were motivated to commit fraud in order to acquire Odyssey, particularly because the transaction "occurred over a small subset of time as compared to the lengthy class period." (*Id.* at 382.)

In addition, the Court found no basis to impute scienter to Gentiva, and thus no basis for corporate liability, reasoning that "the complaint contain[ed] no allegations as to whether these other unnamed employees were acting within the scope of

employment or if there is any other basis to impute their scienter to the employer." (*Id.* at 384.)

The Court further held that the Plaintiff, having failed to plead a primary violation under section 10(b) of the 1934 Act, could not state a secondary liability claim under section 20(a).

However, the Court indicated that it believed "the complaint's shortcomings with regard to scienter could be cured by an amendment." (*Id.* at 397.) Therefore, as to the 1934 Act claims, the Court afforded the Plaintiff leave to file an amended consolidated class action complaint.

On May 10, 2013, the Plaintiff filed an amended consolidated class action complaint, amending only those allegations relevant to the element of scienter. The newly-added allegations will be described in greater detail later. The amended consolidated class action complaint again asserts claims against all named defendants for violations of Section 10(b) of the 1934, and Rule 10b–5, arising thereunder. The amended consolidated class action complaint also alleges that each of the Individual Defendants violated Section 20(a) of the 1934 Act, thus rendering them jointly and severally liable for damages. To the extent the Plaintiff re-asserts the 1933 Act causes of action, those claims are dismissed with prejudice in accordance with the Court's original Memorandum and Order.

On June 24, 2013, the Defendants moved to dismiss the amended consolidated class action complaint for failure to state a claim. Because the Court has previously found that the Plaintiff adequately pleaded actionable false and misleading statements and loss causation for purposes of the 1934 Act claims, this Memorandum and Order will only address whether the Plaintiff has adequately plead scienter on the part of the Individual Defendants and Gentiva as

a corporate entity, and potential liability of the Individual Defendants under Section 20(a) of the 1934 Act.

### C. *Other Pending Cases*

In addition, it is important to note that nearly identical actions have been commenced against three other publicly-traded health providers, Almost Family, Inc. ("Almost Family"), Amedisys, Inc. ("Amedisys"), and LHC Group, Inc. ("LHC") in the U.S. District Courts for the Western District of Kentucky, the Middle District of Louisiana, and the Western District of Louisiana, respectively. *See In re Almost Family, Inc. Sec. Litig.,* 10 Civ. 00520 (W.D.Ky.); *Bach v. Amedisys, Inc.,* 10 Civ. 00395 (M.D.La.); *City of Omaha Police and Fire Ret. Sys. v. LHC Grp., Inc.,* 12 Civ. 01609 (W.D.La.). On February 10, 2012, the *Almost Family* court dismissed the complaint in that action with prejudice. On June 28, 2012, the *Amedisys* court dismissed the complaint in that action. On April 9, 2013, a motion for reconsideration in the *Amedisys* action was denied. Meanwhile, on March 15, 2013, the *LHC* court denied the defendants' motion to dismiss. However, on May 23, 2013, the *LHC* court granted the defendants' motion to certify an interlocutory appeal on the issue of loss causation.

### II. DISCUSSION

### A. *Legal Standard*

Under the now well-established *Twombly* standard, a complaint should be dismissed pursuant to Fed.R.Civ.P. Rule 12(b)(6) only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Second Circuit has explained that, after *Twombly,* the Court's inquiry under Rule

12(b)(6) is guided by two principles. *Harris v. Mills,* 572 F.3d 66 (2d Cir.2009) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)).

"First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " *Id.* at 72 (quoting *Iqbal,* 129 S.Ct. at 1949). As explained by the Second Circuit, "[i]n considering a motion to dismiss a 10(b) action, we must accept all factual allegations in the complaint as true and must consider the complaint in its entirety." *Slayton v. Am. Express Co.,* 604 F.3d 758, 766 (2d Cir.2010); *see Tellabs, Inc. v. Makor Issues & Rights,* 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007) ("faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true").

" 'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss' and '[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Id.* (quoting *Iqbal,* 129 S.Ct. at 1950). Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and ... determine whether they plausibly give rise to an entitlement of relief." *Iqbal,* 129 S.Ct. at 1950. This plausibility standard is applicable to securities fraud pleadings. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (observing that to survive 12(b)(6) dismissal, securities fraud plaintiffs "must provide the grounds upon which [their] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level' ") (quoting *Twombly,* 127 S.Ct. at 1965). The issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Todd v. Exxon Corp.,* 275 F.3d 191, 198 (2d Cir. 2001) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

■ Of particular importance here, "[a] complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Federal Rule of Civil Procedure 9(b) by stating with particularity the circumstances constituting fraud." *Slayton,* 604 F.3d at 766.

**B. *Scienter***

■ In order to state a claim under Section 10(b) and Rule 10b–5, the complaint must provide "particular allegations giving rise to a strong inference of scienter"—"that the defendant acted with the required state of mind." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187, 196 (2d Cir.2009) (internal quotation marks omitted). The "requisite state of mind" in 10b–5 claims is " 'intent to deceive, manipulate, or defraud.' " *Tellabs,* 127 S.Ct. at 2504 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). "Recklessness" also suffices. *ECA,* 553 F.3d at 198. Accordingly, in order to satisfy the pleading requirements of § 10(b) and Rule 10b–5 with respect to scienter, the plaintiff may "alleg[e] (1) [facts] showing that the defendants had both motive and opportunity to commit the fraud; or (2) [facts] constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns,* 493 F.3d at 99. "Where motive is not apparent, it is still possible to

plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir.2001) (internal citation omitted).

■ The element concerning "motive and opportunity to defraud" requires a showing that the defendants "benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir.), *cert. denied*, 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000). *But see id.* at 311 ("Although litigants and lower courts need and should not employ or rely on magic words such as 'motive and opportunity,' we believe that our prior case law may be helpful in providing guidance as to how the 'strong inference' standard may be met."). Interestingly, the motives "that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation," do not establish the requisite scienter. *Id.* Typically, a plaintiff must show that officers made false statements in order to sell their own shares at a profit. *Id.* "Sufficient motive allegations must entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *In re SLM Corp. Sec. Litig.*, 740 F.Supp.2d 542, 557 (S.D.N.Y. 2010). Plaintiffs must allege a "unique connection between the fraud and the [benefit]." *ECA*, 553 F.3d at 201 n. 6.

■ Alternatively, if a plaintiff pleads scienter under the "strong circumstantial evidence" prong, he or she must "specifically allege [the] defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308. Further, "[w]here plaintiffs contend [that] defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* at 309 (internal citation omitted); *accord ECA*, 553 F.3d at 198 (under the alternative "strong circumstantial evidence" prong, circumstances that "may give rise to a strong inference of the requisite scienter" include allegations that defendants "engaged in deliberately illegal behavior," or "knew facts or had access to information suggesting that their public statements were not accurate," or "failed to check information that they had a duty to monitor") (internal citation omitted).

■ "Regardless of the manner in which a plaintiff attempts to plead scienter, at the end of its evaluation, this Court must be convinced that the inference of scienter is at least as compelling as any competing inferences." *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F.Supp.2d 218, 225 (S.D.N.Y.2009) (internal quotation marks omitted). With regard to the strength of the inference, the inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 127 S.Ct. at 2504–05. Thus, the Supreme Court has held that the PSLRA's strong inference standard is satisfied "[w]hen the allegations are accepted as true and taken collectively . . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference[.]" *Tellabs*, 551 U.S. at 326, 127 S.Ct. 2499; *see also Akerman v. Arotech Corp.*, 608 F.Supp.2d 372, 382 (E.D.N.Y. 2009) ("When the competing inferences rest in equipoise, the 'tie . . . goes to the plaintiff.' ") (quoting *City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F.Supp.2d 464, 472 (S.D.N.Y.2008)). As the PSLRA requires, a complaint must "state with particularity facts giving rise to a strong in-

ference" of scienter for each defendant. 15 U.S.C. § 78u–4(b)(2).

The Second Circuit has clarified these pleading requirements in light of the passage of the PSLRA and explained that a court need not obstinately tie itself to the ideas described above. Rather, district courts are encouraged to look at a variety of factors and keep in mind how other courts have approached the issue of scienter in the securities fraud context. However, generally speaking, the inference of scienter "may arise where the complaint sufficiently alleges that the defendants: (1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *South Cherry St. LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir.2009). The court "must assess 'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Local No. 38 Int'l Bhd. of Electrical Workers Pension Fund v. Am. Express Co.*, 724 F.Supp.2d 447, 458 (S.D.N.Y.2010) (quoting *Tellabs*, 551 U.S. at 323, 127 S.Ct. 2499).

### i. *As to the Allegations of Scienter Against the Individual Defendants*

The Plaintiff has made several factual allegations that potentially constitute circumstantial evidence of conscious misbehavior or recklessness as well as allegations concerning the Defendants' motive and opportunity to commit the fraud. The Court will assess all of the Plaintiff's allegations with regard to scienter, keeping in mind that the Court must take a holistic approach to the analysis.

### a. *Conscious Misbehavior or Recklessness: Internal Documents and Emails And Confidential Witnesses*

The amended consolidated class action complaint repeats the references to a number of Gentiva internal documents and emails uncovered by the SFC which, the Plaintiff contends, supports an inference of scienter. The Plaintiff also points to what it refers to as the "Parting Comments Email," which was cited in the SFC Report. This email was sent to the Defendant Strange on May 3, 2010 from a Gentiva Physical Therapist and Orthopedics Director, Confidential Witness 1, which states, in part, that this individual has "see[n] the push to treat by metrics not by what the patients need … Treating by numbers is also making the clinicians feel their professional judgment is questioned. Again, not sitting on plateaus is understandable but pushing to thresholds based on what their diagnosis is, not by what the patient needs is just wrong."

The Court previously discounted the importance of these emails on the basis that these communications did not suffice, in and of themselves, to establish scienter because they did not "demonstrate a leap in logic from legal behavior—increasing therapy visits in a medically necessary way in order to maximize profits—to illegal behavior—increasing therapy visits in ways that are not medically necessary in order to maximize profits." (Memorandum and Order, 932 F.Supp.2d at 373–74.) However, the Court acknowledged that "[t]hese emails may be relevant to the Plaintiff's attempts to set forth a coherent and sufficiently cogent scienter narrative in light of other circumstantial evidence." (*Id.* at 374.) In this regard, the Court commented that "while the emails in this case are not conclusive of scienter, they may be part of a bigger picture that when

viewed in a timeline, paints a compelling inference of scienter." (*Id.* at 375.)

Here, in addition to repeating the allegations contained in the original consolidated class action complaint, the Plaintiff alleges that Monica Hullinger, Gentiva's Regional Vice President for the Mid–Atlantic Region, and other Gentiva Executives were aware of two anonymous letters Hullinger received in January 2010 reporting a culture of fraud at Gentiva's Charleston, West Virginia Branch. (Amended Consol Class Action Compl. ¶ 63.) One letter discussed instructions that "management expects us . . . to attain the golden number of twenty . . ." and expressed the view that Gentiva's "business model" was "[i]increasing the therapy skilled visits when it's not really called for . . ." (*Id.*) The second letter, dated January 15, 2010, complained of various directives by management to engage in improper conduct and further complained that "[w]e now have a meeting every Monday at 8:30A.M. so therapists and assistants can be informed how to better defraud Medicare." (*Id.*) The Plaintiff alleges that, shortly after receipt of these two letters, Edwina Simpson, Gentiva's Assistant Vice President of Human Resources for the region, met with employees of the Charleston office and thereafter reported to Hullinger that several of the employees she met with did, indeed, raise concerns about Medicare fraud taking place at the office. (*Id.*).

Similarly, the Plaintiff cites a complaint in a separate case filed by Leeveta Holstein, a former nurse at the Charleston branch. In that complaint, Holstein alleges that Gentiva managers engaged in "upcoding" and altering patients charts in order to increase Medicare reimbursements. Holstein also alleged that she and other Gentiva employees complained to Gentiva management in February 2010 about the

pattern and practice of Medicare fraud at Gentiva's Charleston branch. (*Id.* at ¶ 62.)

These allegations only concern alleged events at a single Gentiva branch in Charleston, West Virginia and therefore do not speak to a company-wide corporate culture. As to Holstein's allegations, "Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R.Civ.P. 12(f)." *RSM Prod. Corp. v. Fridman*, 643 F.Supp.2d 382, 403 (S.D.N.Y. 2009) (citation omitted.)

In any event, these allegations do little to build upon the allegations in the original consolidated class action complaint because none of them establish, as they must, that the Individual Defendants "knew or had access to information showing that Gentiva was pressuring its staff to provide as many therapy visits as possible to receive extra Medicare payments without consideration of patients' needs." (Memorandum and Order, 932 F.Supp.2d at 378.) The Individual Defendants are still "[not] alleged to have knowledge of or access to contemporaneous information that would show that their representations were false." (*Id.*).

To be sure, "the Court's view of scienter is not confined to these communications but rather is influenced by a holistic approach." (*Id.* at 374.) Accordingly, the Court will assess the other allegations supporting an inference of scienter.

Indeed, the original consolidated class action complaint, and now the amended consolidated class action complaint, contain accounts from certain confidential witnesses ("CWs") which generally concern a number of low-level employees who had the impression and/or belief that they were being subjected to pressure from their direct supervisors to increase the number of

patient visits provided in order to hit the next highest enhanced Medicare reimbursement threshold, regardless of the patients' medical needs.

As noted above, the Court credited these accounts insofar as the CWS were described with sufficient particularity so that the person in each respective position likely would have had the information that each CW purported to have. Further, the Court acknowledged that the CWs were from different ranks and from different geographies, thereby supporting a company-wide inference of scienter. However, the Court observed:

> The main issue with regard to the CW allegations, and one that is potentially fatal, concerns whether the CWs' accounts sufficiently allege that executives at the company—namely the Individual Defendants—knew or had access to information showing that Gentiva was pressuring its staff to provide as many therapy visits as possible to receive extra Medicare payments without consideration of patients' needs. In other words, the Court must assess whether there are allegations that the CWs were privy to the Individual Defendants' knowledge or had direct contact with the Individual Defendants, such that the Individual Defendants are alleged to have knowledge of or access to contemporaneous information that would show that their representations were false.

(*Id.* at 378). In the Court's view, the "Plaintiff's allegation that the Executive Defendants tolerated [or encouraged medically unnecessary therapy visits for financial gain] [wa]s conclusory because [the] Plaintiff does not plead that any of the Executive Defendants were even aware of the practice." (*Id.*).

In the amended consolidated class action complaint, the Plaintiff introduces the allegations of a former Regional Director of Clinical Operations for Gentiva's Western Region ("CW 8"). CW 8 was employed by Gentiva from approximately January 2010 until July 2012 and, during the relevant time period, reported to John Aurelio, Gentiva's Regional Vice President for the Western Region. With regard to pressure being asserted on lower level managers and clinicians by senior management to satisfy enhanced Medicare payment thresholds that required 6, 14, or 20 visits, CW 8 recalled that at one particular regularly scheduled regional meeting of executives and managers from the Western Region in 2010, Aurelio, in the presence of various Gentiva executives and managers, told CW 8 something to the effect—"do not tell me that if you can provide 13 visits, you cannot do 14 visits."

However, the amended consolidated class action complaint continues to fail to tie the scienter allegations to any Individual Defendant. *See Campo v. Sears Holdings Corp.*, 371 Fed.Appx. 212, 217 (2d Cir.2010) (finding that scienter was not alleged where a confidential witness "had no knowledge of whether [the individual defendants] actually accessed or reviewed the reports."); *In re Citigroup Inc. Sec. Litig.*, 753 F.Supp.2d 206, 245 (S.D.N.Y.2010) (holding "[f]atal to plaintiffs' claims[,]" a failure to allege that confidential witnesses presented information to individual defendants); *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F.Supp.2d 287, 299 (S.D.N.Y.2010) ("Plaintiffs should, but do not, provide specific instances in which Defendants received information that was contrary to their public declarations."); *City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F.Supp.2d 464, 472–74 (S.D.N.Y.2008) (no inference of scienter where the Plaintiffs failed to allege individual defendants were provided with contradictory information);

cf. *City of Omaha Police and Fire Ret. Sys. v. LHC,* 2013 WL 1100819 at *4 (W.D.La. Mar. 15, 2013)(finding inference of scienter alleged where the individual defendant Chief Executive Officer allegedly "repeatedly signed certifications attesting that he personally reviewed and evaluated LHC's internal controls").

Each of the CWs, including the new CW 8, are all former Gentiva branch and other clinicians. The Defendants assert that the CWs were all many levels removed from them and the Plaintiffs do not allege anything to the contrary.

Indeed, the "Plaintiffs allege no direct contact between [the] CW[s] and Defendants," rendering their scienter allegations insufficient as a matter of law. *In re Wachovia Equity Sec. Litig.,* 753 F.Supp.2d 326, 358 (S.D.N.Y.2011); *see also In re Am. Express Co. Sec. Litig.,* No. 02 Civ. 5533(WHP), 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008) (discounting allegations where Plaintiffs "failed to allege any facts showing that the confidential sources . . . had any contact with the Individual Defendants"); *Local No. 38 IBEW Pension Fund v. Am. Express Co.,* 724 F.Supp.2d 447, 460 (S.D.N.Y.2010) (same). In this regard, the newly-added allegations, considered separately and with the original allegations, fail to remedy the deficiencies in the original consolidated class action complaint previously identified by the Court. Neither the anonymous letters nor the *Holstein* lawsuit is alleged to have been addressed or provided to any of the Individual Defendants; the Plaintiff does not allege that any of the Individual Defendants are named in the *Holstein* lawsuit, or involved in the wrongdoing alleged therein.

Even viewing the allegations of scienter as a whole, the Plaintiff has not alleged sufficient circumstantial evidence of conscious misbehavior or recklessness, and so the amended consolidated class action complaint fails to allege a strong inference of scienter based on this theory. Accordingly, the Plaintiff will not be permitted to present this theory at the trial.

### b. *Motive and Opportunity: The Defendants' Sales of Gentiva Securities*

Having failed to allege facts constituting strong circumstantial evidence of conscious misbehavior or recklessness, the Plaintiff may still establish scienter by alleging facts to show that the Individual Defendants had both motive and opportunity to commit fraud.

There is no question that "motive can be shown . . . 'when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit.'" *In re Citigroup Inc. Sec. Litig.,* 753 F.Supp.2d 206, 233 (S.D.N.Y.2010) (quoting *ECA,* 553 F.3d at 198). "However, the mere fact that insider stock sales occurred does not suffice . . . , [instead] [p]laintiffs must establish that the sales were 'unusual' or 'suspicious.'" *In re Gildan Activewear, Inc. Sec. Litig.,* 636 F.Supp.2d 261, 270 (S.D.N.Y.2009) (internal quotation marks and citation omitted).

■ "Whether trading was unusual or suspicious turns on factors including (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5–1 plans." *Glaser v. The9, Ltd.,* 772 F.Supp.2d 573, 587 (S.D.N.Y.2011).

██ A plaintiff alleging motive and opportunity in connection with stock sales must allege not only the defendants' selling activity during the class period, but also the defendants' net profits rather than their gross proceeds, in addition to the overall percentage changes in the defendants' holdings. *See In re eSpeed*, 457 F.Supp.2d at 290 ("The Complaint also omits necessary information concerning (1) the percentage increase in each defendants' holdings during the class period; and (2) the profit from defendants' sales. In particular, plaintiffs plead that Amaitis and Noviello realized 'gross proceeds' of $2.8 million, but the Complaint does not disclose whether either made any profit from the sales.").

██ In the original consolidated class action complaint, the Plaintiff contended that the Defendants were motivated to engage in the wrongful conduct in order to sell inflated Gentiva securities. The Plaintiff stated that the Defendants Malone, Potapchuk, and Strange respectively sold 98%, 96%, and 28% of the Gentiva shares they acquired during the Class Period for proceeds of $3.1 million, $3.2 million, and $756,712. (Compl. ¶¶ 19–21, 276.) However, the Court held that Plaintiff failed to allege the net profits as opposed to reaped "proceeds." The Court also observed that the original consolidated class action complaint, as is required to properly allege motive and opportunity, made no mention of "the change in volume of the insider Defendant's sales; whether sales occurred soon after statements the Defendants are alleged to know to be misleading; whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and whether sales were made pursuant to trading plans such as Rule 10b5–1 plans." (Memorandum and Order, 932 F.Supp.2d at 381.) The Court noted that while there appeared to be a high volume of trading activity, absent factual allegations regarding the net profits or timing of the sales, the Plaintiff failed to sufficiently allege motive and opportunity based on trading activity.

### i. *As to Slusser*

In the amended consolidated class action complaint, Slusser is not alleged to have sold any Gentiva during the Class Period. *In re eSpeed, Securities Litigation*, 457 F.Supp.2d 266, 291 (S.D.N.Y.2006) ("the dispositive factor is that other insiders, including the other two individual defendants, did not sell during the putative class period"). The fact that (1) Slusser was not required to publicly report his transactions in Gentiva common stock until he became the Chief Financial Officer and (2) a material portion of his shares were restricted and not vested does not absolve the Plaintiff of its obligation to make the requisite allegations regarding "unusual or suspicious" trading activity. Accordingly, the Court finds that the Plaintiff has failed to allege an inference of scienter as to Slusser based on motive and opportunity to commit fraud.

### ii. *As to Strange*

During the Class Period, Strange allegedly acquired 109,608 Gentiva shares through the exercise or conversion of stock options and he sold 31,078 Gentiva shares at artificial prices for proceeds of approximately $756,712. Strange allegedly did not purchase any Gentiva shares in the open market. In November and December 2010, about six months after Strange received the Parting Comments Email, Strange allegedly sold 25,000 Gentiva shares at an average price of $24.84 per share.

However, the Plaintiff still fails to allege Strange's net profits during the Class Period. In fact, Strange actually increased his Gentiva holdings by the end of the

Class Period, thereby negating any inference of scienter. *See In re Bristol–Myers Squibb Sec. Litig.*, 312 F.Supp.2d 549, 561 (S.D.N.Y.2004) (defendants' increase in company holdings during class period was "wholly inconsistent with fraudulent intent"). Accordingly, the Court finds that the Plaintiff has failed to raise an inference of scienter as to Strange based on motive and opportunity.

### iii. *As to Malone*

In the amended consolidated class action complaint, the Plaintiff alleges that at the beginning of the Class Period, Malone held 15,357 shares of Gentiva common stock. It also alleges that during the Class Period, Malone acquired 146,775 Gentiva shares through the exercise or conversion of stock options at an average price of approximately $11.02 per share, and he sold approximately 99% of his shares (145,018 shares) at artificially inflated prices and at an average price of $21.02 per share, for gross proceeds of approximately $3.1 million, and "net proceeds" of approximately $2.14 million. According to the Plaintiff, in the six months leading up to the May 13, 2010 disclosure of the Senate Finance Committee investigation, Malone sold 63,018 at artificially inflated prices between $23 and $30. During the Class Period, Malone allegedly did not purchase any Gentiva shares on the open market. By the end of the Class Period, Gentiva's stock apparently crashed, closing at $3.02 per share on October 3, 2011, a decline of approximately 90% from the Class Period high of approximately $30 per share.

The Defendants contend that Malone did not exercise and continued to hold hundreds of thousands of vested options at the end of the Class Period. The Plaintiff counters that it is unremarkable that Malone continued to hold hundreds of thousands of stock options at the end of the Class Period because all of them were below the exercise or strike price—the fixed price at which the owner of the option can buy or sell the underlying security or commodity—and therefore were "under water." Under these circumstances, the Court finds that it is at least as plausible as any other inference that Malone did not exercise his options and sell more Gentiva stock because to do so would have required Malone to pay to exercise underwater stock options.

The Defendants also argue that the Plaintiff's allegations fail to establish that the "sales occurred soon after statements the Defendants are alleged to know to be misleading." (Memorandum and Order, 932 F.Supp.2d at 381.) Indeed, timing is more typically an indicia of fraud where sales occur shortly after insiders allegedly learn undisclosed adverse information or made affirmative misrepresentations, *see, e.g., Stevelman v. Alias Research Inc.*, 174 F.3d 79 (2d Cir.1999); *Ressler v. Liz Claiborne, Inc.*, 75 F.Supp.2d 43, 60 (E.D.N.Y. 1998) ("[T]he Court concludes that the stock sales at issue, being remote in time from any misstatements and in amounts that do not necessarily support a claim of fraud, were not unusual or suspicious and therefore do not demonstrate that defendants had a motive to commit fraud."), or shortly before corrective disclosures are made in the market, *see, e.g., In re KeySpan Corp. Securities Litigation*, 383 F.Supp.2d 358, 385 (E.D.N.Y.2003)(finding that two-month gap between sales and public statement disclosing problems was not "strongly suspicious in light of other factors weighing against an inference of fraud"); *In re Oxford Health Plans, Inc., Secs. Litig.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) ("In late August 1997, two months before the devastating October 27, 1997 press release and in the midst of a NYSID investigation that was eventually going to reveal Oxford's accounting irregularities

and internal control deficiencies, all of the Individual Defendants except Sullivan sold shares of Oxford common stock for aggregate profits of approximately $33,000,000. The timing of these trades is 'suspicious' enough, along with the other evidence, to support a strong inference of scienter.").

Furthermore, the fact that Slusser is not alleged to have sold any Gentiva stock during the Class Period cuts against a finding of scienter as to Malone. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir.1996) (noting that the failure of some individual defendants to sell stock during class period undermined the plaintiffs' allegations that any defendant intended to inflate stock for personal profit); *Acito v. IMCERA Group*, 47 F.3d 47, 54 (2d Cir.1995) ("The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit.") (quotation and citation omitted). *Accord In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 75 (2d Cir.2001) ("the failure of other defendants to sell their stock undermined the plaintiffs' theories that negative information was withheld to obtain a higher sell price."); *In re Glenayre Techs., Inc. Sec. Litig.*, No. 96 Civ. 8252, 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998) (concluding that inference of scienter from some defendants' stock sales was undermined when CEO and other top officers did not sell stock during class period: "Certainly, one can assume that these highranking corporate officers … would be part of any fraudulent scheme to benefit from insider information through preemptive stock sales. The absence of sales from these individuals, then, suggests that … trading by [other] defendants does not give rise to a strong inference of scienter."); *In re Health Mgmt. Systems, Inc.*

*Sec. Litig.*, No. 97 Civ.1965, 1998 WL 283286, at *6 n. 3 (S.D.N.Y. June 1, 1998) (single individual defendant's sales of eighty-two percent of holdings not unusual when six other individual defendants' sales comprised only between three and twenty-five percent of each's individual holdings),

Nonetheless, given the allegations regarding the "net proceeds" and volume of trading activity by Malone, the Court find that these allegations support a compelling inference of scienter as required based on a theory of motive and opportunity. *In re SLM*, 740 F.Supp.2d at 558 (sufficiently unusual when individual defendant "dumped nearly all of his shares during the Class Period."). In the Court's view, this inference is at least as compelling any competing, nonculpable inference.

### iv. *As to Potapchuck*

In the amended consolidated class action complaint, the Plaintiff alleges that, during the Class Period, Potapchuck acquired 120,505 shares through the exercise or conversion of options at an average price of approximately $11.97 per share. He also allegedly sold approximately 96% of his shares (115,883 shares) at artificially inflated prices, and at an average price of $27.17 per share for gross proceeds of approximately $3.2 million, and "net proceeds" of $1.8 million. Potapchuck allegedly did not purchase any Gentiva shares on the open market. According to the Plaintiff, in the six months leading up to the May 13, 2010 disclosure of the Senate Finance Committee investigation, Potapchuck sold 95,883 Gentiva shares at artificially inflated prices between $23 and $30 per share.

It is true that the timing of stock sales six months before announcement of a government *investigation* is not "unusual" where, as here, there is no allegation that the Individual Defendants could foresee

the government's actions. *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F.Supp.2d 576, 595 (S.D.N.Y.2006) ("Moreover, the timing of the Secondary Offering—six months in advance of the filing of the AG Complaint—does not suggest a motive to commit fraud."); *Ressler*, 75 F.Supp.2d at 60 (timing of stock sales six months before release of negative information "does not suggest that defendants meant to realize profits immediately prior to an expected and dramatic fall in the stock's price").

Further, the Defendants assert that many of the stock sales by Potapchuck were made pursuant to 10b5–1 plans or other contractual arrangements. "[I]t is well-established that trades under [a] 10b–5–1 plan do not raise a strong inference of scienter." *Glaser*, 772 F.Supp.2d at 592 (quoting *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F.Supp.2d 261, 272 (S.D.N.Y.2009)); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F.Supp.2d 574, 604 (S.D.N.Y.2007) ("Because Barton's sales were part of a periodic divestment plan [i.e., at 10b5–1 sales plan], the timing and amount of sales do not raise a strong inference of scienter."). However, that axiom does not apply where a 10b5–1 plan is entered into—or strategically amended—to take advantage of an inflated stock price or insider information. *See In re CRM Holdings, Ltd. Secs. Litig.*, No. 10 Civ. 975, 2012 WL 1646888, at *25 (S.D.N.Y. May 10, 2012) (discussing *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F.Supp.2d 1044 (C.D.Cal.2008)). Indeed, where 10b5–1 trading plans are entered into during the class period, they "are not a cognizable defense to scienter allegations on a motion to dismiss." *Freudenberg v. E\*Trade Fin'l Corp.*, 712 F.Supp.2d 171, 201 (S.D.N.Y.2010) (collecting cases). Here, there is no allegation that the trading plans were adopted during the Class Period.

The Plaintiff cites *Freudenberg* for the proposition that the existence of a trading plan pursuant to a Rule 10b5–1 plan is an affirmative defense that cannot be considered on a motion to dismiss. *Id.* ("[T]he existence of *201 a Rule 10b5–1 Trading Plan is an affirmative defense that must be pled and proved."); *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F.Supp.2d 88, 100 (S.D.N.Y.2006)("The fact that there might be an innocent explanation for the timing of [defendant]'s sale is not enough to defeat the inference of scienter that arises from plaintiffs' well-pleaded allegations—which, as defendants keep forgetting, I must accept as true for purposes of this motion to dismiss.")

These cases are at odds with *Glaser*, in which the Southern District noted that trades under 10b–5 plans do not raise a strong inference of scienter, even at the pleading stage. *Glaser*, 772 F.Supp.2d at 592 n. 14 (describing "the established law" of the Southern District); *George v. China Auto. Sys., Inc.*, 11 CIV. 7533 KBF, 2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012)(citing *Glaser* for the proposition that, at the pleading stage, courts may take judicial notice of certain Rule 10b5–1 trading plans). In the original Memorandum and Order, the Court considered as "not determinative" but "relevant" the fact that many of the stock sales by Strange and Potapchuck were made pursuant to 10b–5–1 plans or other contractual arrangements. Again, the Court considers the existence of Rule 10b–5 plans at the pleading stage as but one relevant factor in a holistic analysis. (Memorandum and Order, 932 F.Supp.2d at 370–71.)

In the Court's view, as with Malone, the allegations regarding the "net proceeds" and volume of trading activity by Potapchuck support an inference of scienter based on a theory of motive and opportuni-

ty. *LHC,* 6:12–1609, 2013 WL 1100819, at *5 (W.D.La. Mar. 15, 2013)(finding motive and opportunity on the part of individual defendant Chief Executive Officer who allegedly sold over $20 million of his personal holdings of LHC stock during the Class Period at fraudulently inflated prices).

### ii. *As to Corporate Scienter*

■ With regard to the liability of the company, to plead scienter when the defendant is a corporation, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.,* 531 F.3d 190, 195 (2d Cir.2008). "In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant." *Id.* However, "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Id.* For example, the scienter of an employee acting within the scope of employment can be imputed to the employer. *See Vining v. Oppenheimer Holdings Inc.,* No 08 Civ. 4435, 2010 WL 3825722 at *12 (S.D.N.Y. Sept. 29, 2010) (citing *Defer LP v. Raymond James Financial, Inc.,* 654 F.Supp.2d 204, 212 (S.D.N.Y.2009)). A strong inference of corporate scienter may also be appropriate "where a corporate statement is so important and dramatic that it 'would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.'" *Vining,* 2010 WL 3825722 at *13 (citing *Teamsters Local 445,* 531 F.3d at 196 (internal citation omitted)).

In the consolidated class action complaint, the Plaintiff contended that the allegations supported a strong inference that Gentiva itself acted with the requisite scienter because the allegations suggest that multiple executives at the company such as Area and Regional Vice Presidents were aware of the wrongful conduct alleged in that complaint. The Court previously acknowledged that "it is possible that certain employees who the CWs came into direct contact with could have had the requisite state of mind." (Memorandum and Order, 932 F.Supp.2d at 384.) However, the Court declined to impute scienter to Gentiva, reasoning that "the complaint contains no allegations as to whether these other unnamed employees were acting within the scope of employment or if there is any other basis to impute their scienter to the employer." (*Id.*)

Here, the Plaintiff's conclusory allegations—e.g., "numerous management employees, who were acting on behalf of Gentiva and whose scienter may be imputed to the Company, either directed, knew of and/or recklessly disregarded the wrongful conduct alleged herein" (Am. Compl. ¶ 11)—are insufficient to establish that such employees "were acting within the scope of their employment." However, the Court finds that corporate scienter may be inferred from the "suspicious" insider stock sales by both Malone *and* Potapchuck, high level executives at Gentiva. *Cf. San Leandro Emergency Med. Group Profit Sharing Plan,* 75 F.3d at 813–14 & n. 14 ("[W]e conclude that the sale of stock by one company executive does not give rise to a strong inference of the *company's* fraudulent intent; the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive.") Therefore, the Court finds that the Plaintiff has stated a violation of Section 10(b) of the 1934 Act against Gentiva.

### C. *As to Whether the Plaintiffs States a Claim Under Section 20(a) of the 1934 Act*

■ The Plaintiff also alleges "control person" liability against the Individual De-

fendants under Section 20(a) of the 1934 Act. To state such a claim, a plaintiff must show "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) (quotation marks omitted). "To plead control over a primary violator, a plaintiff must allege 'that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *In re BISYS Sec. Litig.,* 397 F.Supp.2d 430, 451 (S.D.N.Y.2005) (quoting *S.E.C. v. First Jersey Sec. Inc.,* 101 F.3d 1450, 1472–73 (2d Cir.1996)). However, "[a]llegations of control are not averments of fraud and therefore need not be pleaded with particularity under Rule 9(b) or the PSLRA. They need satisfy only the less stringent requirements of Fed.R.Civ.P. 8." *Id.*

The Court previously dismissed the Plaintiff's claim under Section 20(a) of the 1934 Act on the grounds that the Plaintiff failed to (1) state a primary violation under Section 10(b) or (2) adequately allege that the Individual Defendants acted with the requisite scienter. Here, for the reasons stated above, the amended consolidated class action complaint alleges a primary violation of Section 10(b) by Gentiva, Malone, and Potapchuck. Further, the Plaintiff has plausibly pled that Malone and Potapchuck possessed control over Gentiva, a primary violator. Each is alleged to have held a high position as an officer and/or director of Gentiva. Thus, the Plaintiff's § 20(a) claims are dismissed against the Individual Defendants only to the same extent as its § 10(b) claims.

## III.  CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED,** that the Defendants' motion to dismiss the amended consolidated class action complaint is granted (1) as to the Defendants H. Anthony Strange and Eric R. Slusser in its entirety; (2) as against the Defendants Ronald A. Malone, John R. Potapchuck, and Gentiva to the extent the Plaintiff re-asserts the 1933 Act Claims previously dismissed with prejudice in the order dated March 25, 2013; (2) as against Malone, Potapchuck, and Gentiva to the extent the Plaintiff seeks to establish their scienter based on a theory of "conscious misbehavior and recklessness;" and it is further

**ORDERED,** that the Defendants' motion to dismiss is denied to the extent the Plaintiff seeks to establish scienter of the Defendants Malone, Potapchuk, and Gentiva based on a theory of "motive and opportunity."

## SO ORDERED.

### MEMORANDUM OF DECISION AND ORDER

Familiarity with the facts and procedural history of this case is presumed. By way of background, this is a consolidated securities fraud class action brought on behalf of a class consisting of all persons or entities that purchased the publicly traded securities of Gentiva Health Services, Inc. ("Gentiva") between July 31, 2008 and October 4, 2011. The complaint was filed by the Lead Plaintiff the Los Angeles City Employees' Retirement System (the "Plaintiff" or "LACERS"). According to the Plaintiff, Gentiva, a publicly traded health care provider, artificially inflated its stock price through a scheme that involved ordering unnecessary medical care for clients, and then billing the federal government for these illegitimate expenses. The complaint further alleges

that when the scheme came to light, Gentiva's stock price dropped precipitously.

The Individual Defendants originally joined are current and/or former directors and/or officers of the company. Ronald A. Malone previously served as Gentiva's Chief Executive Officer from June 2002 until December 2008, and as Chairman of the Board of Directors until May 2011. H. Anthony Strange served as Gentiva's President beginning in 2007, and served as its Chief Operating Officer from November 2007 through May 2009. Strange then became the company's Chief Executive Officer in January 2009, and its Chairman in May 2011. John R. Potapchuck served as Gentiva's Chief Financial Officer and Treasurer until May 2010. He was succeeded in May 2010 by Eric R. Slusser, who currently serves as the company's Chief Financial Officer, Treasurer, and Executive Vice President.

On March 25, 2013, the Court dismissed the Plaintiff's original consolidated class action complaint in its entirety. *In re Gentiva Sec. Litig.*, 932 F.Supp.2d 352 (E.D.N.Y.2013)(Spatt, J.). In particular, the Court dismissed with prejudice the Plaintiff's claims under §§ 11 and 15 of the Securities Act of 1933 (the "1933 Act") for lack of standing and for failure to state a claim.

The Court also dismissed without prejudice the Plaintiff's claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b–5 promulgated thereunder. The Court observed that to state a claim under Section 10(b) of the 1934 Act and Rule 10b–5 for misrepresentations, "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of

its injury." (Memorandum and Order, 932 F.Supp.2d at 366.)(quotation marks and citations omitted).

The Court found that the Plaintiff adequately pleaded actionable false and misleading statements and loss causation for purposes of the 1934 Act claims. However, the Court held that the Plaintiff failed to adequately plead scienter on the part of the Individual Defendants or Gentiva as a corporate entity.

The Court further held that the Plaintiff, having failed to plead a primary violation under section 10(b) of the 1934 Act, could not state a secondary liability claim under section 20(a).

However, the Court indicated that it believed the complaint's shortcomings with regard to scienter could be cured by amendment. Therefore, as to the 1934 Act claims, the Court afforded the Plaintiff leave to file an amended consolidated class action complaint.

On May 10, 2013, the Plaintiff filed an amended consolidated class action complaint, amending only those allegations relevant to the element of scienter. On June 24, 2013, the Defendants moved pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 12(b)(6) to dismiss the amended consolidated class action complaint for failure to state a claim.

On September 19, 2013, the Court granted in part and denied in part the second motion to dismiss. 971 F.Supp.2d at 305, 2013 WL 5291297. The Court previously found that the Plaintiff adequately pleaded actionable false and misleading statements and loss causation for purposes of the 1934 Act claims. Therefore, the Court only addressed whether the Plaintiff adequately plead scienter on the part of the Individual Defendants and Gentiva, and the potential liability of the Individual Defendants under Section 20(a) of the 1934 Act.

Of relevance here, the Court granted the motion to dismiss as to the Defendants Strange and Slusser in its entirety and as against the Defendants Malone and Potapchuck to the extent the Plaintiffs sought to establish their scienter based on a theory of conscious behavior and recklessness.

However, the Court denied the motions to dismiss to the extent the Plaintiff sought to establish scienter on the part of Malone and Potapchuk based on a theory of motive and opportunity. As described in more detail later, the Court relied on allegations regarding insider stock sales by Malone and Potapchuck during the Class Period. The Court also denied the motion to dismiss as to Gentiva because the Court concluded that corporate scienter could be inferred from the "suspicious" insider stock sales by both Malone and Potaphuck. The Court further held that the Plaintiff stated a claim for control person liability under Section 20(a) of the 1934 Act as against Malone and Potapchuck.

On October 3, 2013, Gentiva, Malone, and Potapchuck moved pursuant to Rule 6.3 of the Local Rules of the United States District Court for partial reconsideration of the September 19, 2013 order. Gentiva, Malone, and Potapchuck seek to have the remaining claims against them dismissed. The remaining claims are the section 10(b) claims against Gentiva, Malone, and Potapchuk and the section 20(a) claims against Malone and Potapchuk. The Plaintiff opposes the motion for partial reconsideration.

For the following reasons, the motion for partial reconsideration is granted in part and denied in part.

## I. DISCUSSION

### A. Legal Standard on Motion for Reconsideration

Motions for reconsideration may be brought pursuant to Fed.R.Civ.P. 59(e) and 60(b) and Local Rule 6.3. See Wilson v. Pessah, No. 05–CV–3143, 2007 WL 812999, at *2 (E.D.N.Y. Mar. 14, 2007). A motion for reconsideration is appropriate when the moving party believes the Court overlooked important "matters or controlling decisions" that would have influenced the prior decision. Shamis v. Ambassador Factors Corp., 187 F.R.D. 148, 151 (S.D.N.Y.1999). Reconsideration is not a proper tool to repackage and relitigate arguments and issues already considered by the Court in deciding the original motion. See United States v. Gross, No. 98–CR0159, 2002 WL 32096592, at *4 (E.D.N.Y. Dec. 5, 2002) ("A party may not use a motion to reconsider as an opportunity to reargue the same points raised previously."). Nor is it proper to raise new arguments and issues. See Lehmuller v. Inc. Vill. of Sag Harbor, 982 F.Supp. 132, 135 (E.D.N.Y.1997). Reconsideration may only be granted when the Court did not evaluate decisions or data that might "reasonably be expected to alter the conclusion reached by the court." Wechsler v. Hunt Health Sys., 186 F.Supp.2d 402, 410 (S.D.N.Y.2002) (internal quotation marks and citation omitted).

### B. Legal Standard on Motion to Dismiss

Under the now well-established Twombly standard, a complaint should be dismissed pursuant to Fed.R.Civ.P. Rule 12(b)(6) only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Second Circuit has explained that, after Twombly, the Court's inquiry under Rule 12(b)(6) is guided by two principles. Harris v. Mills, 572 F.3d 66 (2d Cir.2009) (citing Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)).

"First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Id.* at 72 (quoting *Iqbal,* 129 S.Ct. at 1949). As explained by the Second Circuit, "[i]n considering a motion to dismiss a 10(b) action, we must accept all factual allegations in the complaint as true and must consider the complaint in its entirety." *Slayton v. Am. Express Co.,* 604 F.3d 758, 766 (2d Cir.2010); *see Tellabs, Inc. v. Makor Issues & Rights,* 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007) ("faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true").

" 'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss' and '[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal,* 129 S.Ct. at 1950). Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and ... determine whether they plausibly give rise to an entitlement of relief." *Iqbal,* 129 S.Ct. at 1950. This plausibility standard is applicable to securities fraud pleadings. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (observing that to survive 12(b)(6) dismissal, securities fraud plaintiffs "must provide the grounds upon which [their] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level' ") (quoting *Twombly,* 127 S.Ct. at 1965). The issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Todd v. Exxon Corp.,* 275 F.3d 191, 198 (2d Cir. 2001) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

Of particular importance here, "[a] complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Federal Rule of Civil Procedure 9(b) by stating with particularity the circumstances constituting fraud." *Slayton,* 604 F.3d at 766.

## C. *Scienter*

In order to state a claim under Section 10(b) and Rule 10b–5 of the 1934 Act, the complaint must provide "particular allegations giving rise to a strong inference of scienter"—"that the defendant acted with the required state of mind." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187, 196 (2d Cir.2009) (internal quotation marks omitted). The "requisite state of mind" in 10b–5 claims is " 'intent to deceive, manipulate, or defraud.'" *Tellabs,* 127 S.Ct. at 2504 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). "Recklessness" also suffices. *ECA,* 553 F.3d at 198.

Accordingly, in order to satisfy the pleading requirements of § 10(b) and Rule 10b–5 with respect to scienter, the plaintiff may "alleg[e] (1) [facts] showing that the defendants had both motive and opportunity to commit the fraud; or (2) [facts] constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns,* 493 F.3d at 99. "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the

strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir.2001) (internal citation omitted).

The element concerning "motive and opportunity to defraud" requires a showing that the defendants "benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir.2000), *cert. denied*, 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000); *but see id.* at 311 ("Although litigants and lower courts need and should not employ or rely on magic words such as 'motive and opportunity,' we believe that our prior case law may be helpful in providing guidance as to how the 'strong inference' standard may be met."). Interestingly, the motives "that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation," do not establish the requisite scienter. *Id.* Typically, a plaintiff must show that officers made false statements in order to sell their own shares at a profit. *Id.* "Sufficient motive allegations must entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *In re SLM Corp. Sec. Litig.*, 740 F.Supp.2d 542, 557 (S.D.N.Y.2010). A plaintiff must allege a "unique connection between the fraud and the [benefit]." *ECA*, 553 F.3d at 201 n. 6.

"Regardless of the manner in which a plaintiff attempts to plead scienter, at the end of its evaluation, this Court must be convinced that the inference of scienter is at least as compelling as any competing inferences." *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F.Supp.2d 218, 225 (S.D.N.Y.2009) (internal quotation marks omitted). With regard to the strength of the inference, the inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 127 S.Ct. at 2504–05. Thus, the Supreme Court has held that the PSLRA's strong inference standard is satisfied "[w]hen the allegations are accepted as true and taken collectively . . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference[.]" *Tellabs*, 551 U.S. at 326, 127 S.Ct. 2499; *see also Akerman v. Arotech Corp.*, 608 F.Supp.2d 372, 382 (E.D.N.Y. 2009) ("When the competing inferences rest in equipoise, the 'tie . . . goes to the plaintiff.' ") (quoting *City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F.Supp.2d 464, 472 (S.D.N.Y.2008)). As the PSLRA requires, a complaint must "state with particularity facts giving rise to a strong inference" of scienter for each defendant. 15 U.S.C. § 78u–4(b)(2).

The Second Circuit has clarified this pleading requirement in light of the passage of the PSLRA and explained that a court need not obstinately tie itself to the ideas described above. Rather, district courts are encouraged to look at a variety of factors and keep in mind how other courts have approached the issue of scienter in the securities fraud context. However, generally speaking, the inference of scienter "may arise where the complaint sufficiently alleges that the defendants: (1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *South Cherry St. LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir.2009). The court "must assess 'whether all of the facts alleged, taken collectively, give rise to a

strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Local No. 38 Int'l Bhd. Of Electrical Workers Pension Fund v. Am. Express Co.,* 724 F.Supp.2d 447, 458 (S.D.N.Y.2010) (quoting *Tellabs,* 551 U.S. at 323, 127 S.Ct. 2499, 168 L.Ed.2d 179).

## D. *Motive and Opportunity: The Defendants' Sales of Gentiva Securities*

As noted above, the Court previously found that the Plaintiff failed to allege facts constituting strong circumstantial evidence of conscious misbehavior or recklessness as to any of the Individual Defendants or Gentiva, and motive and opportunity to commit fraud as to Slusser and Strange. However, the Court found that the Plaintiff alleged sufficient facts of motive and opportunity to commit fraud by Potapchuck and Malone, and inferred scienter as to Gentiva, determinations of which that the Defendants now seek reconsideration.

### 1. *As to Potapchuck*

The amended consolidated class action complaint alleges that, during the Class Period, Potapchuck acquired 120,505 shares through the exercise or conversion of options at an average price of approximately $11.97 per share. He also allegedly sold approximately 96% of his shares (115,883 shares) at artificially inflated prices, and at an average price of $27.17 per share for gross proceeds of approximately $3.2 million, and "net proceeds" of $1.8 million. Potapchuck allegedly did not purchase any Gentiva shares on the open market. According to the Plaintiff, in the six months leading up to the May 13, 2010 disclosure of a Senate Finance Committee ("SFC") investigation, Potapchuck sold 95,-883 Gentiva shares at artificially inflated prices between $23 and $30 per share.

In moving to dismiss the consolidated class action complaint and subsequently the amended consolidated class action complaint, the Defendants asserted that "many" of the stock sales by Potapchuck were made pursuant to 10b5–1 plans or other contractual arrangements. In its memoranda of law, the Defendants did not specifically quantify the number of trades under 10b5–1 plans made by Potapchuck during the Class Period. Rather, the Defendants attached to their briefs "Form 4s" filed with the Securities and Exchange Commission ("SEC") and Annual Proxy Statements filed with the SEC in 2008 and 2011, which indicated that the 95,883 Gentiva shares sold in the six months leading up to the May 13, 2010 disclosure of the Senate Investigation were done pursuant to 10b5–1 plans.

In the order dated September 19, 2013, this Court acknowledged that trades under a 10b–5–1 plan do not raise a strong inference of scienter. The Court considered as "not determinative" but "relevant" the fact that many of the stock sales by Strange and Potapchuck were made pursuant to 10b5–1 plans or other contractual arrangements. The Court concluded that the allegations regarding the "net proceeds" and volume of trading activity by Potapchuck supported an inference of scienter based on a theory of motive and opportunity.

The Defendants now contend that this Court overlooked critical facts regarding Potapchuk's alleged trading—namely, the actual quantity of 10b5–1 trades as compared to the aggregate number of trades—which facts were submitted to the Court on the prior motions to dismiss. Once the 10b5–1 trades are disregarded, the Defendants assert, all that remains are alleged trades that represented 12%, or 20,000 shares, of Potapchuck's total shares and $300,000 in net profit. Further, the Defendants note that the sale of the 20,000

shares not pursuant to 10b5–1 trades all occurred more than six months before the initial disclosure of the SFC's investigation. The Plaintiff does not dispute these figures, but rather argues that the Court previously rejected the Defendants' contentions regarding Potapchuk's 10b5–1 plan trades.

As this Court has previously noted, trades under a 10b5–1 plan do not raise a strong inference of scienter, even at the pleading stage. *Glaser v. The9, Ltd.*, 772 F.Supp.2d 573, 587 (S.D.N.Y.2011); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F.Supp.2d 574, 604 (S.D.N.Y.2007) ("Because Barton's sales were part of a periodic divestment plan [i.e., at 10b5–1 sales plan], the timing and amount of sales do not raise a strong inference of scienter.").

Here, the Court notes that the Defendants should have specifically quantified the number of 10b5–1 plans in their prior motions to dismiss, rather than relying on the Court to comb through the Defendants' financial records. That said, the Court is persuaded by the argument that, after deducting the actual number of 10b5–1 plan trades by Potapchuck and considering his "net profits" without those trades, the Plaintiff fails to raise the requisite strong inference of scienter as against him. This inference is further weakened by that fact that the non–10b5–1 sales amounting to 12% of Potapchuck's holdings occurred more than six months before the announcement of the government investigation. *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F.Supp.2d 576, 595 (S.D.N.Y.2006) ("Moreover, the timing of the Secondary Offering—six months in advance of the filing of the AG Complaint—does not suggest a motive to commit fraud."); *Ressler v. Liz Claiborne, Inc.*, 75 F.Supp.2d 43, 60 (E.D.N.Y.1998) (timing of stock sales six months before release of negative information "does not suggest

that defendants meant to realize profits immediately prior to an expected and dramatic fall in the stock's price"); *In re KeySpan Corp. Securities Litigation*, 383 F.Supp.2d 358, 385 (E.D.N.Y.2003)(finding that two-month gap between sales and public statement disclosing problems was not "strongly suspicious in light of other factors weighing against an inference of fraud"); *cf. In re Oxford Health Plans, Inc., Secs. Litig.*, 187 F.R.D. 133, 139 (S.D.N.Y.1999) ("In late August 1997, two months before the devastating October 27, 1997 press release and in the midst of a NYSID investigation that was eventually going to reveal Oxford's accounting irregularities and internal control deficiencies, all of the Individual Defendants except Sullivan sold shares of Oxford common stock for aggregate profits of approximately $33,000,000. The timing of these trades is 'suspicious' enough, along with the other evidence, to support a strong inference of scienter.").

Thus, the Court finds that the Court finds that the allegations regarding the "net proceeds" and volume of trade activity—12% of his Gentiva shares yielding $300,000 in "net profits"—by Potapchuck do not support an inference of scienter based on a theory of motive and opportunity. *See Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir.2000) ("Chaimowitz's alleged $1.6 million profit is not unusual even if we look only to the absolute amount of profit, and certainly not if we consider the fact that Chaimowitz sold only 9.9 percent of his GT stock duringthe class period."); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir.1995) (trading not unusual where the defendant sold 30,000 shares representing 11% of his holdings); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F.Supp.2d 261, 271 & n. 5 (S.D.N.Y.2009) (trades found not to be unusual where sales amounted to only 22.5%

and 4.9% of two defendants' respective holdings, including options); *In re KeySpan*, 383 F.Supp.2d at 384–85 (a sales of less than twenty percent of holdings insufficient to establish scienter); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y.1999)("Large volume trades may be suspicious but where a corporate insider sells only a small fraction of his or her shares in the corporation, the inference of scienter is weakened."). Accordingly, the Court grants the Defendants' motion for partial reconsideration to the extent that the remaining 10(b) claim against Potapchuck based on a theory of motive and opportunity is dismissed.

### 2. *As to Malone*

The Court does not reach the same result with respect to Malone. The Defendants contend that because three of the four Individual Defendants—Potapchuk, Strange, Slusser—did not engage in unusual or suspicious trading, there can be no inference of scienter on the part of Malone. To be sure, the fact that Potapchuck, Strange, and Slusser are not sufficiently alleged to have engaged in unusual or suspicious trading "cuts against a finding of scienter as to Malone." 971 F.Supp.2d at 327, 2013 WL 5291297, at *19; *see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir.1996) (noting that the failure of some individual defendants to sell stock during class period undermined the plaintiffs' allegations that any defendant intended to inflate stock for personal profit); *Acito*, 47 F.3d at 54 ("The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit.") (quotation and citation omitted). *Accord In re Scholastic Corp. Securities Litigation*, 252 F.3d 63,

75 (2d Cir.2001) ("the failure of other defendants to sell their stock undermined the plaintiffs' theories that negative information was withheld to obtain a higher sell price."), *cert. denied*, 534 U.S. 1071, 122 S.Ct. 678, 151 L.Ed.2d 590 (2001); *In re Glenayre Techs., Inc. Sec. Litig.*, No. 96 Civ. 8252, 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998) (concluding that inference of scienter from some defendants' stock sales was undermined when CEO and other top officers did not sell stock during class period: "Certainly, one can assume that these high-ranking corporate officers ... would be part of any fraudulent scheme to benefit from insider information through preemptive stock sales. The absence of sales from these individuals, then, suggests that ... trading by [other] defendants does not give rise to a strong inference of scienter.").

However, "none of the[ ] cases [supporting this proposition] established a per se rule that the sale by one officer of corporate stock for a relatively small sum can never amount to unusual trading. Rather, each case was decided on its own facts." *In re Scholastic*, 252 F.3d at 75.

Here, Malone allegedly sold 99% of his shares during the Class Period for approximately $2.14 million. In that regard, this case resembles *In re SLM Corp. Sec. Litig.*, 740 F.Supp.2d at 558 (sufficiently unusual when individual defendant "dumped nearly all of his shares during the Class Period."); *see also In re Scholastic*, 252 F.3d at 75 (sales of eighty percent of holdings sufficiently unusual for single individual defendants).

In this case, as to Malone, the amended consolidated class action complaint alleges that at the beginning of the Class Period, he held 15,357 shares of Gentiva common stock. It also alleges that during the Class Period, Malone acquired 146,775

Gentiva shares through the exercise or conversion of stock options at an average price of approximately $11.02 per share, and he sold approximately 99% of his shares (145,018 shares) at artificially inflated prices and at an average price of $21.02 per share, for gross proceeds of approximately $3.1 million, and "net proceeds" of approximately $2.14 million. According to the Plaintiff, in the six months leading up to the May 13, 2010 disclosure of the SFC investigation, Malone sold 63,018 Gentiva shares at artificially inflated prices between $23 and $30. During the Class Period, Malone allegedly did not purchase any Gentiva shares on the open market. By the end of the Class Period, Gentiva's stock apparently crashed, closing at $3.02 per share on October 3, 2011, a decline of approximately 90% from the Class Period high of approximately $30 per share. There is no contention that Malone sold any of these shares pursuant to 105b–1 plans.

In the Court's view, the Plaintiff has alleged motive and opportunity with respect to Malone. When all of the circumstances surrounding Malone's trading are known, they may ultimately defeat the Plaintiff's claims of individual insider trading and fraud. However, at this point, the Plaintiff's allegations of unusually large insider trades by Malone at suspicious times are sufficient to create a strong inference of scienter as to him. Accordingly, the Court denies the Defendants' motion for partial reconsideration to the extent the 1934 Act claim based on a theory of motive and opportunity against Malone is not dismissed.

### 3. *As to Corporate Scienter*

▮▮▮▮ With regard to the liability of the company, to plead scienter when the defendant is a corporation, "the pleaded facts must create a strong inference that

someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir.2008). "In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant." *Id.* However, "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Id.* For example, the scienter of an employee acting within the scope of employment can be imputed to the employer. *See Vining v. Oppenheimer Holdings Inc.*, No 08 Civ. 4435, 2010 WL 3825722 at *12 (S.D.N.Y. Sept. 29, 2010) (citing *Defer LP v. Raymond James Financial, Inc.*, 654 F.Supp.2d 204, 212 (S.D.N.Y.2009)). A strong inference of corporate scienter may also be appropriate "where a corporate statement is so important and dramatic that it 'would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.'" *Vining*, 2010 WL 3825722 at *13 (citing *Teamsters Local 445*, 531 F.3d at 196 (internal citation omitted)).

In the order dated September 19, 2013, the Court found that the Plaintiff's conclusory allegations—"numerous management employees, who were acting on behalf of Gentiva and whose scienter may be imputed to the Company, either directed, knew of and/or recklessly disregarded the wrongful conduct alleged herein" (Am. Compl. ¶ 11)—were insufficient to establish that such employees "were acting within the scope of their employment." Nonetheless, the Court found that corporate scienter could be inferred from the "suspicious" insider stock sales by both Malone and Potapchuk, high level execu-

tives at Gentiva. 971 F.Supp.2d at 328–29, 2013 WL 5291297, at *21.

■ Having now deemed insufficient the allegations regarding Potapchuk's insider stock sales, the Court finds that the Plaintiff has failed to state a violation of Section 10(b) of the 1934 Act against Gentiva. *San Leandro Emergency Med. Group Profit Sharing Plan,* 75 F.3d at 813–14 & n. 14 ("[W]e conclude that the sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent; the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive.")

4. *As to Whether the Plaintiffs States a Claim Under Section 20(a) of the 1934 Act*

The Plaintiff also alleges "control person" liability against the Individual Defendants under Section 20(a) of the 1934 Act. To state such a claim, a plaintiff must show "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) (quotation marks omitted). "To plead control over a primary violator, a plaintiff must allege 'that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *In re BISYS Sec. Litig.,* 397 F.Supp.2d 430, 451 (S.D.N.Y.2005) (quoting *S.E.C. v. First Jersey Sec. Inc.,* 101 F.3d 1450, 1472–73 (2d Cir.1996)). However, "[a]llegations of control are not averments of fraud and therefore need not be pleaded with particularity under Rule 9(b) or the PSLRA. They need satisfy only the less stringent requirements of Fed.R.Civ.P. 8." *Id.*

Here, the Court has found that the amended consolidated class action complaint alleges a primary violation of Section 10(b) by Malone, a controlled person. Further, the Plaintiff has plausibly plead culpable participation by Malone. Therefore, the Court denies that part of the Defendants' motion for partial reconsideration seeking to dismiss the Plaintiff's Section 20(a) claims.

## II. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED,** that the Defendants' motion for partial reconsideration is granted in part to the extent the remaining claims in the amended consolidated class action complaint against the Defendant John R. Potapchuck—the 10(b) and 20(a) claims under the 1934 Act—are dismissed; and it is further

**ORDERED,** that the Defendants' motion for partial reconsideration is granted in part to the extent the remaining claims in the amended consolidated class action complaint against the Defendant Gentiva—the 10(b) claim under the 1934 Act—is dismissed; and it is further

**ORDERED,** that the Defendants' motion for partial reconsideration is denied in part to the extent the remaining claims in the amended consolidated class action complaint against the Defendant Ronald A. Malone—the 10(b) and 20(a) claims under the 1934 Act—are not dismissed.

**SO ORDERED.**